In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00096-CR


______________________________




JAMES CAMPBELL, JR., Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 336th Judicial District Court


Fannin County, Texas


Trial Court No. 20476




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 James Campbell, Jr., appeals from the revocation of his community supervision. The State
filed a motion to revoke based on allegations Campbell had been involved with the delivery of a
controlled substance to a confidential informant. Campbell contends the trial court abused its
discretion by revoking because the evidence was insufficient to prove he had violated his community
supervision. 

 Our review of an order revoking community supervision is limited to determining whether
the trial court abused its discretion. Rickels v. State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006);
Cardona v. State, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). In determining questions regarding
sufficiency of the evidence in community supervision revocation cases, the State must prove, by a
preponderance of the evidence, that the defendant violated a term of his or her community
supervision. Rickels, 202 S.W.3d at 763. A preponderance of the evidence exists when the greater
weight of the credible evidence creates a reasonable belief that the defendant has violated a condition
of his or her community supervision. Id. at 764; Scamardo v. State, 517 S.W.2d 293, 298 (Tex.
Crim. App. 1974).

 In this case, the State presented evidence from a confidential informant, the police officer for
whom she was working, and a "friend" of the defendant. The officer testified that he took the
informant to Campbell's house to make a drug buy and that (after ensuring that the informant had
no drugs on her person) he gave her money. The informant testified that she went to the house and
that Campbell said, "I'm not doing any business." She walked out, followed by James Cuba, who
took her money and went back into the house. She testified that she heard Cuba talking to Campbell
and heard Campbell say "just a minute" and that Cuba then came back out and gave her crack
cocaine. 

 Cuba testified that he was there when the informant arrived and that, after Campbell had
refused to sell the informant anything, he took her money (less $40.00) to Campbell and got the
drugs, which he then gave to her.

 Campbell argues that the evidence is insufficient because it does not show he delivered drugs
to the confidential informant. He also argues that the evidence is inadequate because the informant's
credibility was questionable, her memory was poor, and because she testified that, at one point while
she was in the house, she had seen Cuba reaching under a mattress where the cocaine was concealed.

 In a community supervision revocation hearing, the trial court is the sole trier of fact and
determines the credibility of the witnesses and the weight to be given their testimony. Cherry v.
State, 215 S.W.3d 917, 919 (Tex. App.--Fort Worth 2007, pet. ref'd). The court may accept or
reject any or all of the witness' testimony. Mattias v. State, 731 S.W.2d 936, 940 (Tex. Crim. App.
1987).

 In this case, there is no evidence Campbell personally delivered the cocaine to the informant. 
However, there is substantial evidence he acted as a party and was thus criminally responsible for
the unlawful act. See Tex. Penal Code Ann. §§ 7.01, 7.02, 7.03 (Vernon 2003). 

 Even though there is some testimony that might have been understood to suggest that Cuba
was exercising some personal control over the contraband (under the mattress), the finder of fact was
not bound to believe this indicated that Cuba had sole control over the contraband. The confidential
informant's testimony was not a model of clarity or consistency, but it does provide evidence of the
criminal act, which was further supported and strengthened by Cuba's testimony. 

 Under this state of the record, we find the State's allegations to be supported by the
preponderance of the evidence and thus cannot find that the trial court abused its discretion by
revoking Campbell's community supervision.

 We affirm.




 Jack Carter

 Justice


Date Submitted: November 26, 2007

Date Decided: December 19, 2007


Do Not Publish


 



t-of-court videotaped
forensic interview--that Barnett touched C.C.'s genitals, as charged in count two, in an incident we
will call the "$50.00 incident." (2) 

 C.C. testified that the $50.00 incident occurred while she was living at her Aunt Bernay's (3)
house and that it was the first sexual contact that occurred between her and Barnett. C.C. testified
that, at some point after she moved into Bernay's house, Barnett placed on C.C.'s bed an envelope
containing $50.00 and a letter asking that he be allowed to touch her. C.C. stated she then went out
to the garage where Barnett was. C.C. testified that, in the garage, Barnett made more requests to
touch her, and then "he stuck his finger in me, . . . and he rubbed his private area." The State asked
if Barnett put his finger "inside your private area," to which C.C. responded, "Yes." The State then
clarified that C.C. meant genitals when she referred to her "private area." Finally, the State asked
C.C. how old she was when this incident happened, to which C.C. responded, "I was 16."

 Although there was no evidence specifically contrary to C.C.'s recall of the $50.00 incident,
C.C. herself testified that she is a medicated paranoid schizophrenic, that she has memory problems,
that she hears voices, and that she is a regular user of both methamphetamine and marihuana. As
for this specific incident, C.C. testified that, during the $50.00 incident, she was "high" and
"paranoid," "wasn't paying attention to anything," and "didn't know what was going on." 

 Barnett seems to assert that, due to C.C.'s admitted drug use, mental illness, and confusion
over dates, C.C.'s testimony should be discounted in its entirety. (4) Additionally, Barnett emphasizes,
as additional reasons to discount C.C.'s testimony, the testimony of defense witnesses that impeached
C.C.'s character for truthfulness, disputed facts underlying other incidents (see discussion of counts
one and three below), and raised doubts about C.C.'s motive and bias in falsely testifying against
Barnett. 

 Having reviewed all of the evidence in the light most favorable to the verdict, and especially
considering C.C.'s specific testimony that the $50.00 incident happened when she was sixteen, we
find that a rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. There was legally sufficient evidence of the age element in support of Barnett's
conviction on count two. 

 Further, we defer to the jury's implied determination that C.C.'s testimony regarding the
$50.00 incident was credible and should be given weight over impeaching testimony, and C.C.'s own
admitted confusion as to the timing of the event, since the jury was in the unique position to be able
to hear and see these witnesses. C.C.'s testimony that the $50.00 incident happened when "I was 16"
is among the most specific testimony she provided over the course of this trial. While the jury could
have chosen to disbelieve C.C., it did not. We will not second-guess that decision here. The
evidence is not so weak that the verdict is clearly wrong or presents a manifest injustice, and there
is not a great weight and preponderance of the evidence contrary to the verdict. The evidence is
factually sufficient.

(4) Evidence is Legally Sufficient, but Factually Insufficient, on Counts One and Three

 C.C. testified to numerous incidents in which Barnett sexually assaulted her, and, as with
count two, Barnett did not request the State to elect the particular incidents serving as the bases of
the indicted and charged offenses in counts one and three. 

 C.C. did not specifically testify, as she had when testifying about the $50.00 incident, that
any particular incident of sexual assault happened while she was under seventeen years old.
Nonetheless, C.C. testified that she had had sexual intercourse with Barnett "three or four" times
while she was sixteen years old. (5) 

 Although the State did not tie this global statement to any particular incidents, C.C. testified
to at least three incidents of sexual intercourse with Barnett that could serve as the basis of the
verdicts on counts one and three. At trial, C.C. testified to three distinct incidents of sexual
intercourse: in the bedroom at Bernay's house; at the pool; and on the day she moved out. The jury
also watched C.C.'s videotaped forensic interview in which, with no reference to time frame, she
described in detail an incident of sexual intercourse on the couch and briefly mentioned that she and
Barnett had had sexual intercourse "on the bed after the rooms got switched" and "in the other bed
too." The State never addressed whether the incidents mentioned on the videotape corresponded to
the incidents C.C. testified to at trial; the videotape was introduced after C.C. had finished testifying. 
None of the incidents described on the videotape or at trial were identified by a date--whether by
day, month, or year, or by reference to some other event--that could place the incidents before C.C.'s
seventeenth birthday, other than through the inference that two or more of these were among the
three or four incidents of sexual intercourse C.C. mentioned in her global statement. 

 We find that the inference that at least two of the numerous described incidents of sexual
intercourse are among those three to four C.C. said occurred before she turned seventeen is
"reasonable based upon the combined and cumulative force of all the evidence when viewed in the
light most favorable to the verdict." See Hooper, 214 S.W.3d at 17. C.C.'s global statement that she
had sexual intercourse as "just described"--so as to be within the elements of counts one and
three--is itself, and considering the inferences drawn therefrom, legally sufficient support for those
counts, when viewed in the light most favorable to the verdict.

 We find on a neutral review of all the evidence, however, that C.C.'s global statement--as
combined with the other evidence and inferences drawn therefrom--is factually insufficient.

 Although C.C. did not testify to any particular timing for the pool incident, Barnett
introduced several witnesses who placed that event after C.C.'s seventeenth birthday. The pool's
owner testified that Barnett introduced him to C.C. at the pool "sometime in September, around the
middle of September, 2003" about a month after C.C. turned seventeen. The pool's owner further
testified he was a bit uncomfortable that C.C. was so young and was there so early in the morning,
so he asked her how old she was and C.C. said she was seventeen. The pool's owner testified that
C.C. had been on his property on more than one occasion, but within the weekend or week of that
time in September about which he was testifying. Bernay also testified that Barnett and C.C. had
gone to the pool the first or second weekend in September, after C.C. was seventeen.

 Similarly, other evidence on the moving out incident places that incident after C.C.'s
seventeenth birthday. C.C. had testified at some length to Barnett's forcible sexual assault of her on
the night she moved out of Bernay's house. Bernay, however, testified that C.C. moved out "the
second or third week of September 2003," specifically "September 16th or 17th of 2003," at which
time C.C. was seventeen. C.C. admitted she moved out after she was seventeen, although she
believed this was in 2004 instead of 2003. Additionally, a police report in evidence indicated that
this event occurred in September 2003, after C.C.'s seventeenth birthday. 

 Other than C.C.'s global statement that she had sexual intercourse with Barnett three or four
times when she was sixteen, nothing ties the pool incident or the moving out incident to a date before
C.C.'s seventeenth birthday. The great weight and preponderance of the evidence supports a finding
that the pool and moving out incidents occurred after C.C.'s seventeenth birthday. 

 We are left to assess the sufficiency of the evidence that the incident "in the bedroom" to
which C.C. testified at trial and the additional incidents C.C. mentioned on the videotape occurred
while C.C. was sixteen years old. We find that C.C.'s global statement, and the inference that the
testified-to incidents are among those three or four that occurred when C.C. was sixteen, is too weak
to sustain the verdict. Viewing all the evidence in a neutral light, this is simply not a reasonable
inference to make. (6) Only the global statement supports the finding on the age element, and this
evidence is so weak as to objectively undermine confidence in the jury's determination. We must
conclude that evidence is so weak that the verdict is clearly wrong and manifestly unjust. The
evidence on counts one and three is factually insufficient.

 Accordingly, as to count two, we affirm the trial court's judgment; and, as to counts one and
three, we reverse and remand for a new trial consistent with this opinion.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: October 4, 2006

Date Decided: April 10, 2007


Do Not Publish
1. The jury assessed Barnett's punishment at seventy-five years' imprisonment per count. The
court sentenced him to three concurrent seventy-five-year terms. 
2. There was also evidence of other incidents of Barnett's touching of C.C.'s genitals: (1) the
"moving out" incident; (2) the "time at Lake Fannin"; and (3) the woods incident. Because Barnett
did not request the State to elect the particular incident serving as the basis of the indicted and
charged offense in count two, and because we find the evidence regarding the $50.00 incident
sufficient to support the verdict, we need not examine the sufficiency of the evidence of these other
incidents. 
3. Bernay is Barnett's mother. 
4. Despite these protestations, Barnett has never contested C.C.'s competency as a witness. See
Tex. R. Evid. 601.
5. The testimony in context is as follows:


 Q: [by the State] How many times did you have sexual intercourse, what
you just described? How many times did you have sexual intercourse with Ray
Barnett while you were living at [sic] Aunt Bernay while you were 16?


 A: [by C.C.] Three or four.

 

 Q: Do you remember the dates exactly?

 

 A: No. 
6. In addition to the drug use, memory problems, and mental illness discussed above, we also
note  the  voluminous  evidence  of  C.C.'s  inability  to  assess  time:  though  C.C.  turned 
seventeen August 15, 2003, she told the jury that she turned seventeen on August 15, 2004; C.C.
testified that she dropped out of school in May 2001 when she was fifteen, though she was fourteen
in May, 2001. Additionally, C.C. testified to impossible time frames. C.C. testified three times that,
after leaving her aunt's house, she stayed with her mother "for about three years" and then with her
boyfriend for seven months and various others for shorter periods of time, all supposedly between
September 2003 and trial in October 2005, two years later. C.C. also testified that she was in jail and
was released "6th of October - - September - - October - - yes, of October" 2005. In assessing the
time between her October 6 release from jail and her testimony against Barnett five days later on
October 11, 2005, C.C. testified to staying at Myra's "about a week," then at Mandy's for "two
weeks," and then at Linda's, where she's been "about four days. . . . No, it's been about a week and -
- a week and today."